IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IN RE: ) | |
| ) | Chapter 11 |
| EQUIPMENT ACQUISITION ) | |
| RESOURCES, INC., ) | |
| ) | Case No. 09 B 39937 |
| Debtor. ) | |
| ) | |
| WILLIAM A. BRANDT, JR., solely in his ) | Hon. Timothy A. Barnes |
| capacity as Plan Administrator for ) | |
| Equipment Acquisition Resources, Inc., ) | |
| ) | |
| Plaintiff, ) | Adv. No. 11 A 02227 |
| v. ) | |
| ) | |
| IBM CREDIT, LLC, ) | |
| ) | |
| Defendant. ) | |

TIMOTHY A. BARNES, Judge.

MEMORANDUM DECISION

The federal district courts have "original and exclusive jurisdiction" of all cases under title 11 of the United States Code (the "Bankruptcy Code"). 28 U.S.C. § 1334(a). The federal district courts also have "original but not exclusive jurisdiction" of all civil proceedings arising under title 11 of the Bankruptcy Code, or arising in or related to cases under title 11. 28 U.S.C. § 1334(b). District courts may, however, refer these cases to the bankruptcy judges for their districts. 28 U.S.C. § 157(a). In accordance with section 157(a), the District Court for the Northern District of Illinois has referred of all of its bankruptcy cases to the Bankruptcy Court for the Northern District of Illinois. N.D. Ill. Internal Operating Procedure 15(a).

A bankruptcy judge to whom a case has been referred may enter final judgment on any core proceeding arising under the Bankruptcy Code or arising in a case under title 11. 28 U.S.C. § 157(b)(1). A proceeding to avoid and recover preferences and fraudulent conveyances arises in a case under title 11 and is specified as a core proceeding. 28 U.S.C. § 157(b)(2)(H).

Accordingly, final judgment is within the scope of the court's authority.

## PROCEDURAL HISTORY

This matter comes before the court on the motion of defendant, IBM Credit, LLC ("IBM" or "Defendant"), to dismiss the amended adversary complaint (the "Complaint") filed by plaintiff, William Brandt, Jr. in his capacity as Plan Administrator for Equipment Acquisition Resources, Inc. ("EAR", "Debtor" or "Plaintiff"). The Complaint, as described below, seeks the recovery of approximately $4.7 million in lease payments alleged to have been fraudulently transferred from EAR to KLC as part of a fraudulent lease scheme orchestrated by one Sheldon Player ("Player"). Defendant seeks dismissal under Federal Rule of Civil Procedure ("Rule") 12(b)(6) for failure to state a claim upon which relief may be granted or to plead fraud with the particularity required by Rule 9(b).

## BACKGROUND

Unless otherwise indicated, the following facts are taken from Plaintiff's Complaint and are assumed to be true for purposes of the motion to dismiss, all reasonable inferences being drawn in Plaintiff's favor. *See, e.g., Cole v. Milwaukee Area Technical College District*, 634 F.3d 901, 903 (7th Cir. 2011).

EAR was incorporated in 1997. It was designed to operate as a refurbisher of special machinery, a manufacturer of high-end technology parts, and a process developer for the manufacture of high-technology parts. The bulk of EAR's stated revenue derived from refurbishing and selling high-tech machinery; it was set up to purchase high-tech equipment near the end of its useful life at prices that were low relative to the cost of new units, and then refurbish using a propriety process the equipment for sale to end-users at substantial gross margins.

Eventually, EAR's apparent success came to an end, because of Player's abuse of EAR. Player systematically and repeatedly caused EAR to enter into unnecessary and harmful agreements related to over-valued machinery. As part of his scheme, Player caused EAR to enter into financing and financing-type lease agreements with certain entities (the "Financial Entities") related to equipment that was allegedly owned by Machine Tools Direct, Inc. ("MTD"). However, MTD was a mere strawman in Player's scheme. Many, if not all, of the sale invoices from MTD to the Financial Entities grossly overstated the value of the underlying equipment. MTD "purchased" the equipment from EAR mere days before MTD sold the equipment to either EAR or the Financing Entity. In those instances, Player purportedly caused EAR to transfer title to the equipment to MTD, and MTD then sold that equipment to EAR (or the Financial Entity in the case of a lease) at an inflated purchase price. As a result of this scheme, Player caused EAR to lease equipment at a cost far in excess of its actual value.

EAR did not benefit from these circular transfers, as EAR paid far more for the equipment under the financing or lease agreements than it ever received via the sale to MTD. Moreover, Player's defalcations further prevented EAR from having the funds necessary to repay the related financing or lease obligations, thus requiring EAR to enter into an increasing number of these transactions in order to have sufficient funds to repay its current obligations.

Plaintiff contends that "[i]n effect, Player's misconduct amounted to a Ponzi-scheme where funds from later Financing Entities were used to repay EAR's obligations under earlier financing and lease obligations." Complaint, at ¶ 15.

In 2009, after receiving numerous notices of default from its creditors, EAR sought the assistance of outside counsel and turn-around specialists in order to assist in the company's rehabilitation. After some investigation, EAR's outside counsel and consultants discovered what they believed to be evidence of potential fraud in EAR's leasing activity.

Upon this discovery, EAR's officers and directors resigned on October 8, 2009. With the resignation of the former officers and directors, Player too lost any power to influence or control EAR's operations. Plaintiff was then elected as sole member of the board of directors and as the Chief Restructuring Officer, vested with power to assume full control of EAR's operations and all the powers and duties of the President, Chief Executive, and Treasurer of EAR. Pursuant to these powers, Plaintiff filed, on October 23, 2009 (the "Petition Date"), EAR's voluntary chapter 11 petition.

On July 15, 2010, the court confirmed EAR's Second Amended Plan of Liquidation (the "Plan"), and William Brandt, Jr. was appointed as the Plan Administrator (the "Plan Administrator"), with the authority to pursue "Litigation Claims," as defined in the Plan. Plaintiff seeks to bring the claims alleged in the Complaint pursuant to that authority.

## PLAINTIFF'S TRANSACTIONS WITH DEFENDANT

According to Plaintiff, on or about December 3, 2007, IBM entered into an Installment Payment Master Agreement with EAR (the "Master Agreement"). Under the terms of the Master Agreement, IBM provided financing for the purchase of equipment that was further described in any "Supplement" to the Master Agreement. The Supplements provided that EAR was required to make monthly payments to IBM with respect to the equipment identified in the Supplements. In total, there were at least six separate Supplements related to the Master Agreement, all of which were entered into between the date of the Master Agreement and May 2008.

Plaintiff alleges upon information and belief that Player caused EAR to enter into the Master Agreement because doing so furthered his fraudulent scheme. The transactions with IBM are the type of financing arrangements that Player used to perpetuate his scheme. As a result of the scheme, EAR creditors that had financing agreements and leases which were part of Player's scheme have been unable to identify what, if any, equipment that was previously located at EAR's facilities was subject to a valid security agreement or lease. Plaintiff contends that because the transfers made to IBM were part of Player's fraudulent scheme, the transfers that EAR made to IBM in satisfaction of the obligations under the Master Agreement were made with the actual intent to hinder, delay, and defraud EAR's remaining creditors.

Within two years preceding the filing of the Chapter 11 petition, and specifically from January 2008 through June 2009, EAR made transfers to IBM in accordance with the requirements of the Master Agreement totaling $4,689,810.81. Plaintiff seeks the avoidance of those transfers

under 11 U.S.C. § 548(a)(1)(A), 11 U.S.C. § 544(b)(1) and 740 ILCS 160/5(a)(1) and the recovery of same for the benefit of the estate under 11 U.S.C. § 550.

DISCUSSION

1. The "Reasonably Equivalent Value" Rule

Defendant contends that the Complaint should be dismissed because the lease payments made by EAR to Defendant were contractually required payments in satisfaction of antecedent debt for which EAR received reasonably equivalent value. Relying, *inter alia*, on *B.E.L.T., Inc. v. Wachovia Corp.*, 403 F.3d 474 (7th Cir. 2005) and *Sharp Int'l Corp. v. State St. Bank and Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43 (2d Cir. 2005), Defendant argues that the payments should be analyzed as preferences, and not as fraudulent transfers.

The Plan Administrator responds that the Complaint states claims for transfers made with actual fraudulent intent and that lack of "reasonably equivalent value" is not an element of such claims. The claim in Count I is brought under section 548(a)(1)(A) of the Bankruptcy Code, which provides that the trustee may avoid transfers made within two years before the filing of the petition if the debtor made them "with actual intent to hinder, delay, or defraud" its creditors.[1] The claim in Count II is brought under the state law counterpart provision, 740 ILCS 160/5(a)(1), which also requires "actual intent to hinder, delay, or defraud any creditor of the debtor."[2] According to the Plan Administrator, the *B.E.L.T.* and *Sharp* decisions are inapposite, because their holdings are limited to constructively fraudulent transfers - - one element of which is the receipt of "less than a reasonably equivalent value."[3]

---

[1] Section 548 provides in pertinent part as follows:

(a)(1) The trustee may avoid any transfer ... of an interest of the debtor in property, or any obligation ... incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily--

(A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted ... .

11 U.S.C. § 548(a)(1)(A).

[2] Section 5(a)(1) of the Illinois Uniform Fraudulent Transfer Act, reads as follows:

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(1) with actual intent to hinder, delay, or defraud any creditor of the debtor ... .

740 ILCS 160/5(a)(1). The statute of limitations under the Illinois act is generally four years after the transfer. 740 ILCS 160/10.

[3] Constructively fraudulent transfers are avoidable under § 548(a)(1)(B), which provides in pertinent part that the trustee may avoid any transfer of the debtor's property or any obligation incurred by the debtor within two years before the petition, if the debtor:

The court agrees. In *Meoli v. The Huntington Nat'l Bank (In re Teleservices Group, Inc.)*, 469 B.R. 713, 758 (Bankr. W.D. Mich. 2012), the bankruptcy court rejected the defendant's contention that preferential payments to creditors and fraudulent transfers are mutually exclusive, and in so doing, aptly summarized both *B.E.L.T.* and *Sharp*:

> [I]n *Sharp*, the Second Circuit did not reject out of hand the bankruptcy estate's claim that the preferential transfers were also actually fraudulent; rather, it did so only because the estate had not alleged sufficient facts to support the more difficult contention that there had also been actual fraud. 403 F.3d at 56 ("[T]he intentional fraudulent conveyance claims fails [sic] for the independent reason that Sharp [the estate] inadequately alleges fraud with respect to the transaction that Sharp seeks to void ... [T]he $12.25 million payment was at most a preference between creditors...."). Similarly, in *B.E.L.T.*, the Seventh Circuit said only that the transaction challenged there was best described as "a preference among creditors." 403 F.3d at 477. It did not, though, say that the transfer could not have been a fraudulent transfer as well. Rather, the panel found that there simply were not enough facts.

*Meoli*, 469 B.R. at 758.

Thus, while a transfer made in satisfaction of antecedent debt is made for "value," *see* 11 U.S.C. § 548(d)(2)(A), such a transfer may nonetheless have been made with actual fraudulent intent. In determining whether a transfer is voidable as intentionally (as opposed to constructively) fraudulent, the focus is on the state of mind of the debtor. "Neither malice nor insolvency are required," and "[c]ulpability on the part of the ... transferees is not essential." *In re Lake States Commodities, Inc.*, 253 B.R. 866 (Bankr. N.D. Ill. 2000) (internal quotations omitted). Unlike transfers that are only constructively fraudulent, the equivalence of value given in exchange for the actual

---

> (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
>
> (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
>
> (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; [or]
>
> (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured ... .

11 U.S.C. § 548(a)(1)(B).

The state law counterpart for the avoidance of constructively fraudulent transfers, codified at 740 ILCS 160/5(a)(2), is similar to the foregoing provision (except for the statute of limitations).

intent fraudulent transfer is immaterial to the question whether the transfer is actually fraudulent. *Id.*[4]

Again, the Complaint in this case states claims for the avoidance of transfers made with actual fraudulent intent. Accordingly, dismissal is not warranted merely because reasonably equivalent value may have been given through the satisfaction of antecedent debt owed by Debtor to the Defendant.

2. Failure To State a Plausible Claim or To Plead Fraud with Particularity

Defendant also seeks to dismiss the Complaint pursuant to Rule 12(b)(6) for failure to plead a plausible claim or to plead fraud with the particularity required by Rule 9(b).

To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). As noted by the Seventh Circuit in *E.E.O.C. v. Concentra Health Services, Inc.*, 496 F.3d 773 (7th Cir. 2007), the Supreme Court "has interpreted that language to impose two easy-to-clear hurdles. First, the complaint must describe the claim in sufficient detail to give the defendant 'fair notice of what the ... claim is and the grounds upon which it rests.' ... Second, its allegations must plausibly suggest that the plaintiff has a right to relief, raising that possibility above a 'speculative level'; if they do not, the plaintiff pleads itself out of court." *Id.* at 776 (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56, 569 n.14 (2007)). While the complaint need not contain detailed factual allegations, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic*, 550 U.S. at 555-56. The plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Killingsworth v. HSBC Bank Nevada, N.A.*, 507 F.3d 614, 618 (7th Cir. 2007) (citing *Bell Atlantic*).

Where fraud is alleged, a more rigorous pleading standard comes into play. Rule 9(b) provides, *inter alia*, that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Under this standard, a plaintiff must state the "who, what, when, and where" of the alleged fraud. *Uni\*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 923 (7th Cir. 1992).

Again, the Complaint in this case alleges actual intent fraudulent transfers, which require proof that the transfers were made by Debtor "with actual intent to hinder, delay, or defraud" creditors. *See* 11 U.S.C. §548(a)(1)(A); 740 ILCS 160/5(a)(1). The only element at issue here is the actual intent of EAR at the time the transfers were made.

Actual intent to defraud may be proved by circumstantial evidence, often referred to as badges of fraud. The commonly recognized badges of fraud include: "(1) whether the debtor was

---

[4] "Conversely, the transferor's intent is immaterial to the constructively fraudulent transfer in which the issue is the equivalence of the consideration coupled with either insolvency, or inadequacy of remaining capital, or inability to pay debts as they mature." *Lake States*, 253 B.R. at 871.

insolvent at the time of the transfer or became insolvent as a result of the transfer; (2) whether the debtor retained control of the asset; (3) whether the transfer was to a family member; (4) whether the transfer was prior to debtor incurring a substantial debt; (5) whether the transfer was substantially all of debtor's assets; (6) whether the debtor received consideration for the transfer; (7) whether the transfer was disclosed or concealed; (8) whether the debtor made the transfer before or after being threatened with suit by creditors; and (9) whether the debtor absconded." *Grede v. Bank of New York Mellon*, 441 B.R. 864, 881 (N.D. Ill. 2010) (citations omitted). A single badge of fraud is insufficient to establish intent, but the presence of several may create a presumption that the debtor acted with the requisite intent to defraud. *Id.*

Here, the Plan Administrator does not allege badges of fraud. Instead, he alleges that Sheldon Player's misconduct amounted to a *Ponzi* or "*Ponzi*-like" scheme where funds from later leasing or financing entities were used to repay EAR's obligations to earlier equipment lessors and financiers.[5] In essence, the Plan Administrator relies on the "*Ponzi* scheme presumption" to establish that the transfers to the Defendant were made with actual intent to defraud EAR's other creditors.

Proof of a *Ponzi* scheme has been held sufficient to establish actual intent to hinder, delay, or defraud creditors so as to permit avoidance of a transfer as fraudulent. *Id.* (citing *Plotkin v. Pomona Valley Imps., Inc. (In re Cohen)*, 199 B.R. 709, 717 (9th Cir. BAP 1996)). The classic *Ponzi* scheme involves an enterprise which makes payments to investors from money received from more recent investors, rather than from profits of a legitimate business enterprise. *Lake States Commodities*, 253 B.R. at 869 n.2. Proof of a *Ponzi* scheme ordinarily involves evidence that: deposits were made by investors; the *Ponzi* scheme operator conducted little or no legitimate business operations as represented to investors; the purported business operation produces little or no profits or earnings, the source of the funds being new investments by subsequent investors; and the source of payments to investors is cash infused by new investors. *See In re Lake States Commodities, Inc.*, 272 B.R. 233, 242 (Bankr. N.D. Ill. 2002). The facts in this case do not fit the classic *Ponzi* scheme model; the Defendant is not an investor and the Complaint itself alleges that EAR was in the legitimate business of "refurbishing and selling high-tech machinery." Nonetheless, the Plan Administrator contends that EAR's leasing and financing transactions were a "*Ponzi*-like" scheme and, as such, establish EAR's actual fraudulent intent.

Courts have, in fact, recognized that "even if Debtor's business operations do not exactly match the description of a Ponzi Scheme," a trustee may "still continue to characterize the business model as a Ponzi Scheme," thereby meeting the intent prong of a fraudulent transfer claim. *In re Norvergence, Inc.*, 405 B.R. 709, 730 (Bankr. D.N.J. 2009). Here, however, the Plan Administrator has failed to allege sufficient facts to establish even a "*Ponzi*-like" or similar fraudulent scheme with the required particularity. The Complaint makes general and conclusory statements as to the alleged fraudulent scheme, but fails to give any details as to the scheme itself.

---

[5] The original *Ponzi* scheme was the subject of a Supreme Court decision arising out of the bankruptcy of Charles Ponzi. *See Cunningham v. Brown*, 265 U.S. 1 (1924).

There are very few details concerning the "circular transfers" that are alleged to have prevented EAR from having the funds necessary to repay current obligations, thereby requiring EAR to enter into new transactions to repay its current obligations. There are no specific facts or details to support the allegation that payments to earlier lenders were made from later lenders and not from EAR's other revenues or profits. There is not even an indication when the fraudulent leasing activity began, and only the barest outlines of a scheme are sketched.

Moreover, the key allegation of fraud with respect to the transfers at issue here is made on information and belief:

> Upon information and belief, Player caused EAR to agree to enter into the Leases because doing so furthered his fraudulent scheme. The transactions with IBM are of the type of financing arrangements that Player used to perpetuate his wrongful scheme. As a result of the misconduct, EAR creditors that had financing and leases which were part of Player's scheme have been unable to identify what, if any, equipment that was previously located at EAR's facilities was subject to a valid security agreement or lease.

Complaint, at ¶ 20.

While fraud cannot generally be pleaded based on information and belief, such allegations are permitted when the specific facts are not available to the plaintiff and the plaintiff provides the grounds for his suspicions. *See, e.g., Pirelli Armstron Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 443 (7th Cir. 2011). Here, Plaintiff alleges that: EAR entered into unnecessary and harmful financing and lease agreements related to over-valued machinery, that it used a straw man to purchase or lease its own equipment and pocket a portion of the proceeds, and that because the resulting obligations exceeded the money EAR received from the transactions, EAR necessarily entered into an increasing number of these transactions in order to have sufficient funds to repay its current obligations. The allegation then relied on by Plaintiff to connect the subject transfers to this broadly sketched scheme is that the transactions with Defendant "are of the type of financing arrangements" that were used to perpetuate the scheme. Complaint, at ¶ 20.

These allegations are not only insufficient to come within the exception for pleading on "information and belief," they are insufficient in any event to connect the transfers at issue to the alleged scheme.[6] In order "[t]o prevail, the Trustee must plead the requisite intent with respect to each transfer sought to be avoided and must connect the allegations against the Defendants to the Debtors' scheme to defraud creditors." *In re Lancelot Investors Fund, LP*, 451 B.R. 833, 839 (Bankr. N.D. Ill. 2011). Plaintiff does list the dates and amounts of the transfers at issue. However, other than the bald allegation that the transactions with Defendant were "of the type" of financing arrangements that Player used to perpetuate the alleged scheme, Plaintiff fails to describe how the

---

[6] The court notes that while under Rule 9(b), states of mind may be alleged generally, the Supreme Court noted in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), that "generally" as used in Rule 9(b) "is a relative term. In the context of Rule 9, it is to be compared to the particularity requirement applicable to fraud or mistake. Rule 9 merely excuses a party from pleading discriminatory intent under an elevated pleading standard. It does not give him license to evade the less rigid—though still operative—strictures of Rule 8." *Id.* at 686-87.

payments were used to further that scheme and harm EAR's other creditors, the so-called "later lenders."

Again, to survive a motion to dismiss, a complaint must be facially plausible. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Here, the court cannot draw the reasonable inference that the payments to the Defendant were instrumental in an actual fraud by EAR.

Finally, there is merit in Defendant's contention that Plaintiff has failed to establish the requisite fraud in any event, because Player's intent cannot be imputed to Debtor. Player is not alleged to have been a director, officer, or any other type of agent of the debtor corporation. Indeed, Player's relationship to the debtor corporation is not adequately set forth in the Complaint. Under section 548(a)(1)(A) and its state law counterpart, 740 ILCS § 160/5(a)(1), it is the debtor's intent to defraud that must be established. Accordingly, Plaintiff must establish that Player was Debtor's agent in order for Player's alleged fraudulent intent to be imputed to Debtor.

Agency is a "legal relationship whose existence flows from facts," and it is incumbent on the pleader to allege a factual predicate to create the inference of agency. *Rand Bond of N. Am., Inc. v. Saul Stone & Co.*, 726 F. Supp. 684, 686-87 (N.D. Ill. 1989). The existence of an agency relationship may generally be established by circumstantial evidence. *Hartshorn v. State Farm Ins. Co.*, 361 Ill.App.3d 731, 737 (2005) (citations omitted). "If the evidence shows one acting for another under circumstances implying knowledge of those acts by the supposed principal, a *prima facie* case of agency is established." *Id.*

In support of his contention, Plaintiff points merely to the allegations that Player repeatedly caused Debtor to enter into financing and lease agreements for over-valued machinery and that when Debtor's officers and directors resigned, Player lost any power to influence or control Debtor's operations. While these alleged facts may be relevant to the agency issue, they constitute an insufficient factual predicate for an inference of agency. Accordingly, for this additional reason, the Court cannot draw the reasonable inference that the payments to the Defendant were instrumental in an actual fraud by EAR.

## CONCLUSION

For all of the foregoing reasons, the Complaint will be dismissed in one month, on November 1, 2012, unless the Plan Administrator has amended the Complaint to provide the necessary specificity regarding the alleged fraudulent scheme and the transfers allegedly made in furtherance thereof.

A separate order will be issued, concurrent with this Memorandum Decision, (1) granting in part and denying in part Defendant's Motion To Dismiss, (2) providing Plaintiff leave to amend the Complaint no later than October 31, 2012, and (3) providing that the Complaint will be dismissed in

its entirety on November 1, 2012 by separate order of the court if no amendment is properly and timely filed.

Dated: September 28, 2012        ENTER:

_____
Timothy A. Barnes
United States Bankruptcy Judge